LAND, J.
On June 21, 1905, the Railroad Commission of Louisiana adopted order No. *131 450, requiring all trains to stop not less than 200 feet before crossing the track or tracks of another railroad at grade, and if the view is obstructed requiring trains not to proceed until a flagman is sent ahead and the way known to be clear. It was further provided that when a grade crossing is protected by an interlocking device, which has been approved by the Railroad Commission, trains may proceed over such crossing without stopping.
The defendant’s main track crosses at right angles the track of the Hammond Branch of the Yazoo & Mississippi Valley Railroad, about one mile north of the city of Baton Rouge. On June 22, 1908, about 10 o’clock a. m., a freight train of defendant, coming from the north, collided with a mixed train of the said Hammond Branch, coming from the east, at said crossing, which was on grade, and not protected by an interlocking device. At a distance of 200 feet from the crossing, the view was obstructed by trees and other vegetation. In the wreck which followed one passenger was killed, and a number of passengers and railroad employés were injured.
The Railroad Commission, after notice to both companies, proceeded to take testimony, and investigate the cause of the accident. The Commission found both companies guilty of violating order No. 450, and fined each of them the sum of $5,000.
Thereupon the state filed suit to collect the penalty so imposed, as provided by article 286 of the Constitution of 1898. Judgment was' rendered in the court below against the defendant for the sum of $1,000. Defendant has appealed.
Defendant admits that its train was not stopped short of the grade crossing as required by order No. 450, but pleads as an excuse unavoidable accident, in that the air brakes from some inexplicable reason failed to work, and that it was impossible for the engineer to stop in time to avoid the collision. Defendant further pleads that the collision was the result of the failure of the Hammond Branch Company to stop and send a flagman to the crossing, as required by order No. 450.
The state contends that the collision was due to the violation of said order by both companies.
The Commission found that defendant had not provided a “distant signal” to warn the engineer of his approach to the crossing; that the brakeman was riding with the engineer, and was therefore not in a position to respond to the engineer’s emergency call for brakes; and that the only evidence adduced to prove that the air brakes failed to work was the testimony of the engineer in charge of the locomotive.
We are not advised on what grounds the judge a quo found that the defendant was negligent.
Defendant’s engineer in charge of the train testified that he applied the air brakes at a point about 800 or 900 feet from the crossing, and, finding that the application did not check the speed of the train, he then reversed his engine, sanded the rails, and whistled for brakes. The fact that the engine was reversed, which is not disputed, tends to corroborate the statement of the engineer that the air brakes failed to work. Otherwise, there would have been no occasion for the use of the reverse lever. What particular defect in the device caused the failure of the air brakes to operate is not shown by the evidence.
The Hammond train slowed almost to a stop 200 feet from the crossing, but did not send a flagman forward as required by order No. 450 of the Railroad Commission.
This disobedience was the primary cause of the collision. When the Hammond train reached the crossing, the trainmen and passengers thereon saw the defendant’s train *133 approaching. The evidence is very conflicting as to distance, speed, and other circumstances. Defendant’s engineer testified that, when he saw the Hammond train on the crossing, he was about 400 feet distant therefrom, and had already reversed his engine. A passenger in the smoker of the Hammond train testified that he saw defendant’s train about 500 or 600 feet north of the crossing, coming 5 or 6 miles an hour, and heard the whistle before he saw the train. Another passenger in the same coach testified that, when he saw the other train, it was a half or two-thirds of a block away. A passenger in the rear coach testified that he saw defendant’s locomotive coming on under steam at the rate of about 20 miles an hour, and that the whistle was sounded when the engine was within 40 or 50 feet of the coach. The collision overturned the rear coach, and broke the coupling. The locomotive was turned right across the track. One passenger was killed and several wounded. The engineer of the Hammond train testified that the engineer of the defendant’s train reversed his engine when about 200 feet from the crossing, and came on at a speed of from 20 to 25 miles an hour. The fireman on the Hammond train testified that, when defendant’s train blew for brakes, it was about 70 or 75 feet from the crossing. The conductor of the Hammond train had notice that a train was on defendant’s main track, some half a mile away, but took the chances of crossing ahead of it should it chance to come his way. According to his testimony, the train came on at a speed of 20 or 25 miles an hour, and, when it came within one or two car lengths of the crossing, gave one or two short blasts of the whistle, and then crashed into the rear coach. The conductor of the Hammond train was thrown by the jar out of the door of the baggage car, and his leg was broken. The defendant’s engineer estimated his speed when he reached the crossing at from 5 to 7 miles an hour. He admitted that his train was running at the rate of 18 or 20 miles an hour on a downgrade when he attempted to check its speed by the application of the air brakes. He should have stopped 200 feet north of the crossing. As it was, his locomotive, when it reached the crossing, was going at a speed of from 5 to 20 miles an hour. The preponderance of the testimony tends to show that the engineer of defendant’s train on the occasion in question did not take' timely precautions to stop short of the crossing. The usual precautions are, first, to apply the air brakes; second, to reverse the engine; and, lastly, to blow for the hand brakes. The statement of defendant’s engineer as to time of the reversal of the engine is contradicted by the statement, of the engineer of the Hammond train. Several witnesses, one of them a passenger,, stated that the whistle for brakes was not sounded until the defendant’s locomotive was within 50 or 60 feet of the crossing. As the whistle should have been sounded immediately after the reversal of the engine, the inference is that the engine was not reversed at the time stated by defendant’s engineer. A day or two before the collision the schedule of the Hammond train had been advanced about 30 minutes. This fact was not known to defendant’s engineer, and therefore he had no reason to believe that there was any danger of meeting the Hammond train on the crossing in question. This circumstance may account for his failure to be more vigilant.
A number of experts were introduced on the part of the defendant to show the mechanism and operation of the Westinghouse air brake, and that at times the machinery of that device would fail to operate for causes not to be foreseen. There is necessarily some physical cause for the nonoperation of an automatic machine, and an expert should be able to detect and remedy the de *135 feet. In the case at bar the air brake machinery attached to the locomotive was broken by the collision, and therefore the cause of the alleged nonoperation of the machine could not be ascertained. The fact that air brakes may get out of order is recognized by the rules of the defendant company, which require their inspection at terminal stations on the arrival and departure of each train. The rules further provide as follows:
“Conductors and engineers will be held responsible for testing the air before leaving terminals; and when they pick up cars at stations, for personally knowing that the air is cut in and working on cars that are equipped with air in working order.”
Defendant’s train on the morning in question, at the station 4 Yz miles north of the crossing, picked up several cars. The coupling of these cars and the management of the air hose was left to two colored brakemen. While the brakemen were thus employed, the engineer remained in his cab, and the conductor did not supervise the work. Hence neither personally knew that the air had been properly cut in and was working on the cars. The work of the brakemen may have been defective. It is more reasonable to assume that such was the case than to presume that the air brakes were put out of commission by the movement of the train for the short distance of four miles. However, if the Westinghouse air brakes are liable at any time, without assignable cause or reason, to cease, to operate, it behooves railroad companies and their employés to take notice of the fact, and to take precautions against the happening of such a contingency. In other words, air brakes should be tested in ample time to resort to the reverse lever and hand brakes in order to stop the train' at the proper place.
The burden of proof is on the defendant’ to show unavoidable accident, and we do not think that this burden has been discharged.
Judgment affirmed.